UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RAFAEL IGNACIO GUERRERO SANCHEZ, | : | |
| Petitioner | : | |
| | : | |
| v. | : | CASE NO. 1:15-CV-2423 |
| | : | |
| MARY SABOL, et al., | : | |
| Respondents | : | |

*M E M O R A N D U M*

*I.        Introduction*

          Presently before the court are two motions filed by petitioner Rafael Ignacio

Guerrero Sanchez[1] ("Petitioner").  Petitioner has moved for the reopening or

reconsideration (Doc. 25) of this court's September 19, 2016 order.  Petitioner has also

moved for enforcement (Doc. 26) of the same order.  For the following reasons,

Petitioner's motion for reconsideration will be denied, and his motion for enforcement will

be granted.

*II.       Background*

          According to Petitioner, he entered the United States in July of 1990

without inspection.  (Doc. 9-1 at 13).  In August of 1997, he married a lawful permanent

resident—now United States citizen—Sandra Guerrero, née Avila.  (<u>See</u> Doc. 26-1 at 12,

---

[1] Due to the caption of Petitioner's initial habeas corpus filing, wherein he put his last name first, earlier court documents in this case sometimes refer to Petitioner's last name as "Ignacio," when in fact his full name is Rafael Ignacio Guerrero Sanchez, often shorted to "Rafael Guerrero." (<u>See generally</u> Doc. 1 & Attachments; Doc. 26 & Attachments).

49).  Together Petitioner and his wife have three children—all United States citizens.  (Id.

at 12).   At some later point, he left the United States and traveled to Mexico, and then

attempted to re-enter the United States on January 24, 1998, using multiple false

documents.[2]  (Doc. 9-1 at 13).  On the same date, he was found to be inadmissible and

an expedited order of removal was entered against him for having attempted to illegally

enter the United States.[3]  (Id. at 7).  Petitioner was removed from the United States to

Mexico that day pursuant to the expedited removal order, see 8 U.S.C. § 1225(b)(1).

Soon thereafter, Petitioner illegally re-entered the United States. (Doc. 9-1

at 13).  In 2012, Petitioner was arrested and eventually pleaded guilty in the United

States District Court for the District of Idaho to conspiracy to distribute in excess of fifty

grams of methamphetamine, 21 U.S.C. §§ 846, 841(a)(1).  (Doc. 9-1 at 9).  In April 2013,

he was sentenced to forty-two months' imprisonment.  (Id. at 9-10).

Prior to his guilty plea and sentencing, on December 5, 2012, Petitioner

was served with a notice of intent to reinstate the January 24, 1998 order of removal.

(See id. at 13-14).  At that time he expressed a fear of returning to Mexico and was

referred to a Department of Homeland Security ("DHS") asylum officer for a reasonable-

---

[2] Petitioner claims the reason he traveled to Mexico on January 24, 1998, and returned to the United States the same day was to obtain prescription medication, presumably at a lower cost, for his mother, who had been injured in a car accident.  (Doc. 26-1 at 10).

[3] There is some confusion as to the particular subsection of 8 U.S.C. § 1182 under which Petitioner was found to be inadmissible—whether subsection (a)(6)(C)(i): misrepresentation "in general," or (a)(6)(C)(ii): misrepresentation by "falsely claiming citizenship."  The difference has important immigration ramifications, as a violation of subsection (a)(6)(C)(i) permits a waiver of inadmissibility in some circumstances, while there is no waiver available for a violation of subsection (a)(6)(C)(ii).  See 8 U.S.C. § 1182(a)(6)(C)(iii); § 1182(i).  Petitioner's January 24, 1998 "Determination of Inadmissibility," (Doc. 9-1 at 7), indicates that he was found inadmissible under subsection (a)(6)(C)(i), while his November 7, 2007 denial of Form I-601 "Application for Waiver of Grounds of [Inadmissibility]," (Doc. 26-1 at 25), indicates he was inadmissible under (a)(6)(C)(ii) due to a false claim of United States citizenship.  Because Petitioner utilized false documents while trying to re-enter the United States on January 24, 1998, the appropriate inadmissibility subsection appears to be the latter—(a)(6)(C)(ii).

fear interview.  (Id. at 14).  On August 23, 2013, the removal order was reinstated.  (Id. at 3).  On April 9, 2015, Petitioner filed with the Third Circuit a petition for review and a motion for a stay of removal.  (See id. at 14).  On June 12, 2015, the Third Circuit dismissed the petition and denied the motion to stay.  (Id.)

Meanwhile, Petitioner served his time in prison for the drug offense and was taken into custody by Immigration and Customs Enforcement ("ICE") on May 19, 2015.  (Doc. 1-1 at 7; Doc. 9-1 at 14).  He had served only thirty-seven months of the forty-two-month sentence due to good behavior.  (Doc. 26-1 at 44).  On June 1, 2015, ICE conducted a file custody review of Petitioner's detention, informing him that he was currently being detained but that he would be considered for supervised release if he was not removed within the statutory removal period set forth in 8 U.S.C. § 1231(a).  (Doc. 1-1 at 8).  Petitioner was also informed that his custody status would be reviewed on or about August 2, 2015.  (Id.)

On June 29, 2015, an asylum officer found Petitioner's fear of return to Mexico to be reasonable and referred him to an immigration judge for consideration of an application for withholding of removal under 8 U.S.C. § 1231(b)(3), and for protection under the Convention Against Torture ("CAT"), see 8 C.F.R. § 1208.16.  (Doc. 9-1 at 17).  On September 23, 2015, the immigration judge denied withholding of removal under section 1231(b)(3) because Petitioner's drug offense qualified as a "particularly serious crime," thus making Petitioner ineligible for relief under that section.  (Id. at 21).

The immigration judge also decided that Petitioner was not entitled to protection under the CAT for two reasons: (1) he could not show that torture would result from the consent of the Mexican government; and (2) he could not show that the

government would turn "a blind eye" to the potential torture of Petitioner by a drug cartel. (Id. at 24).  On October 19, 2015, Petitioner appealed the immigration judge's decision on his CAT claim to the Board of Immigration Appeals ("BIA").  (Doc. 1-1 at 36).

In the meantime, Petitioner's custody status was reviewed on August 5, 2015.  (See id. at 33-34).  ICE decided to keep him in custody as a flight risk because he had attempted to enter the United States using false documents and then entered the country after being removed, indicating an "intent to evade the immigration controls of the United States." (Id. at 34).  Petitioner's custody status was again reviewed on November 17, 2015.  (Id. at 36).  ICE again decided to keep him in custody, stating, "Due to your pending case, ICE is unable to move forward with your removal from the United States at this time.  Pending a final determination of your fear case, you are to remain in ICE custody at this time." (Id.)  ICE also advised Petitioner that the decision to detain him did not preclude him from producing evidence in the future that his removal was "unlikely." (Id.)

On January 19, 2016, the BIA denied Petitioner's appeal and affirmed the immigration judge's denial of Petitioner's application for protection under the CAT, citing 8 C.F.R. §§ 1208.16-18.  (Doc. 9-1 at 29).  Petitioner filed with the Third Circuit a petition for review of the BIA's decision accompanied by a motion for a stay of removal. Guerrero v. U.S. Att'y Gen., No. 16-1217 (3d Cir. Feb. 1, 2016).  On the same day, the Third Circuit granted a temporary stay of removal, pursuant to a standing order, while it considered the motion for a stay of removal.  (Doc. 9-1 at 31).  On May 4, 2016, the Third Circuit granted a stay of removal while it considered the petition for review, citing Nken v. Holder, 556 U.S. 434-36 (2009) (setting out the factors to be considered by a court when

implementing a stay in removal cases, including that the stay applicant must make "a strong showing that he is likely to succeed on the merits" and demonstrate that he would be "irreparably injured absent a stay").  (Doc. 26-1 at 42).

Prior to the BIA determination and Third Circuit grant of a stay of removal, on December 17, 2015, Petitioner—acting pro se—filed for habeas corpus relief in this court pursuant to 28 U.S.C. § 2241.  (Doc. 1).  In his petition, he sought a bond hearing due to his continued detention while his removal proceedings made their way through the administrative system.  (Id.)  The habeas case was referred to a magistrate judge, who recommended that the petition be denied.  (Doc. 19 at 20).  Upon de novo review, this court rejected the magistrate judge's recommendation, and on September 19, 2016, ordered that Petitioner be given a bond hearing before an immigration judge within twenty-one days.  (Doc. 24).

Petitioner's bond hearing was initially scheduled for September 28, 2016, (Doc. 26-1 at 3), but was canceled at the last minute and rescheduled for October 6, 2016, (id. at 5).  Petitioner did not receive notice of the change until September 29, 2016.  (Id. at 2).  On October 6, 2016, a bond hearing was conducted by Immigration Judge John P. Ellington, who denied bail, finding that Petitioner was a flight risk and a danger to the community.  (Id. at 7).

Prior to the rescheduled bond hearing, on October 3, 2016, Petitioner had submitted a "motion to reopen/reconsider," which was not docketed until October 11, 2016, presumably due to a lag in the prisoner (or, here, detainee) mail system.  (See Doc. 25).  In this motion, Petitioner requested that his bond hearing be conducted by the district court rather than an immigration judge.  (Id. at 2).  On October 14, 2016,

Petitioner filed a "motion for the court to enforce its prior order," (Doc. 26), claiming that the bond hearing before the IJ was deficient for a number of reasons, and requesting that this court conduct its own bail determination, (id.).

Notably, several days after Petitioner filed the motion to enforce, the Third Circuit granted his petition for review based on his application for protection under the CAT, vacated the January 19, 2016 order of the BIA, and remanded the matter to the BIA for further proceedings.  Guerrero v. U.S. Att'y Gen., No. 16-1217 (3d Cir. Oct. 19, 2016); (Doc. 37-1).  In its opinion, the Third Circuit found that the IJ and the BIA had too narrowly construed the government-acquiescence-to-torture standard under the CAT. Guerrero v. U.S. Att'y Gen., No. 16-1217, at 6 (3d Cir. Nov. 30, 2016).  The Third Circuit concluded that

> the BIA erred by failing to consider whether record evidence of the violence caused by the Sinaloa cartel and corruption of law enforcement officials demonstrated that it is more likely than not that Guerrero will be tortured "by or at the instigation of or with the consent or acquiescence of a public official . . . ."  If it is, Guerrero may have met his burden under the CAT.

Id. at 7 (citation omitted).

Respondents contend that Petitioner's motion for reconsideration should be denied because he failed to meet the standard necessary to entitle reconsideration of the case, and also because the motion is moot.  (Doc. 30 at 4-9).  Respondents further argue that Petitioner's motion to enforce should be denied because Petitioner's "sole remedy to grieve his bond hearing is to appeal the decision to the [BIA]."  (Id. at 4, 9-12). The motions have been fully briefed and are ripe for disposition.

III.        *Discussion*

As an initial matter, the court will dismiss as moot Petitioner's "motion to reopen/reconsider," (Doc. 25). In this motion, Petitioner requests that the district court perform the bond hearing, rather than an immigration judge. (Id. at 2). However, as Petitioner has already received a bond hearing held by an immigration judge, the motion to "reopen/reconsider" is now moot. See Flores-Torres v. Mukasey, 548 F.3d 708, 710 & n.3 (9th Cir. 2008) (dismissing as moot immigrant's habeas claim regarding continued detention without an individualized custody hearing because he had been provided such a hearing after filing his habeas petition but before the court of appeals issued its decision). Accordingly, the only remaining motion is Petitioner's motion to enforce.

A.  This Court Has the Power to Enforce Its Writ of Habeas Corpus

At issue in the instant case is the bond hearing Petitioner received on October 6, 2016. He claims that this hearing was legally insufficient under the standards set forth in the prevailing case law and under constitutional due process requirements. Respondents, on the other hand, claim that the hearing satisfied the constitutional and legal prerequisites, and any disagreement Petitioner has with the outcome must be channeled through the administrative system. Respondents essentially assert that Petitioner's only avenue to challenge his recent bond hearing is to appeal to the BIA. This court disagrees.

It is true that a discretionary determination by an immigration judge regarding bail for an alien being detained under section 1226 is not reviewable in this court. See 8 U.S.C. § 1226(e); Sylvain v. U.S. Att'y Gen., 714 F.3d 150, 155 (3d Cir. 2013). It is likewise true, however, that issues of constitutionality and law are fair game for the district

court to consider under its habeas corpus jurisdiction. <u>Sylvain</u>, 714 F.3d at 155 (citing

<u>Singh v. Holder</u>, 638 F.3d 1196, 1202 (9th Cir. 2011) (explaining that section 1226(e) does

not deprive federal courts of "habeas jurisdiction over constitutional claims or questions of

law")).  This jurisdiction includes the concomitant power to ensure compliance with writs of

habeas corpus the court has granted.  <u>See</u> <u>Gibbs v. Frank</u>, 500 F.3d 202, 205 (3d Cir.

2007) (explaining that district courts have continuing jurisdiction to address alleged

noncompliance with writs of habeas corpus).  Thus, while the court will not, and cannot,

review an immigration judge's discretionary bail decision, it most certainly has the power

under its habeas jurisdiction to enforce compliance with its habeas writs.

B. <u>The Relevant Bond Hearing Requirements</u>

In the case at bar, compliance with the court's writ is measured against the

legal requirements for bond hearings for immigrants being detained pursuant to 8 U.S.C.

§ 1226[4] who have successfully asserted that continued detention without an individualized

bond hearing is unconstitutional or unlawful.  Those requirements are set forth in case law,

rather than by statute or regulation.  <u>See</u> <u>Leslie v. Holder</u>, 865 F. Supp. 2d 627, 636 (M.D.

Pa. 2012) (explaining that in habeas proceedings where the "alleged unreasonable

detention of an immigrant detainee" is concerned, the governing law is provided by the

federal courts and the constitution, rather than by agency regulations).

The starting point is <u>Diop v. ICE/Homeland Sec.</u>, 656 F.3d 221 (3d Cir.

2011).  In <u>Diop</u>, the Third Circuit explained that the purpose of continued detention must

be to facilitate the detention statute's goals of "ensuring that an alien attends removal

---

[4] The court, in its September 19, 2016 memorandum, determined that Petitioner—who is subject to a reinstated order of removal but has pending an application for protection under the CAT—is being detained under 8 U.S.C. § 1226 ("pre-removal" detention) rather than 8 U.S.C. § 1231 ("post-removal" detention).  (<u>See</u> Doc. 23 at 7-11).

proceedings and that his release will not pose a danger to the community." Id. at 231. The government must justify its continued detention of the detainee. Id. at 232. Accordingly, the government bears the burden of proving, at the bond hearing, "that continued detention is necessary to fulfill the purposes of the detention statute." Id. at 233.

Importantly, the bond hearing a section 1226 detainee receives must be "individualized." Chavez-Alvarez v. Warden York Cty. Prison, 783 F.3d 469, 478 (3d Cir. 2015); Leslie v. U.S. Att'y Gen., 678 F.3d 265, 271 (3d Cir. 2012); Diop, 656 F.3d at 233. Mechanistic reliance on factors that are common to all section 1226 detainees will not suffice. See Singh v. Holder, 638 F.3d 1196, 1205-06 (9th Cir. 2011) (explaining that all alien detainees in section 1226 bond hearings presumably have at least one crime in their past giving rise to their removal orders, and have been ordered removed by a final, administrative order, and thus the presence of these factors alone does not necessarily warrant denial of bail); Chi Thon Ngo v. I.N.S., 192 F.3d 390, 398-99 (3d Cir. 1999).

Furthermore, the assessment of a section 1226 detainee's dangerousness and risk of flight must be made on a current basis. In Chi Thon Ngo v. I.N.S., 192 F.3d 390 (3d Cir. 1999), the Third Circuit emphasized the importance of making a present assessment of a detainee's level of risk in light of the fundamental liberty interest at stake:

> When detention is prolonged, special care must be exercised so that the confinement does not continue beyond the time when the original justifications for custody are no longer tenable. The fact that some aliens posed a risk of flight in the past does not mean that they will forever fall into that category. Similarly, presenting danger to the community at one point by committing crime does not place them forever beyond redemption. Measures must be taken to assess the risk of flight and danger to the community on a *current basis*. The stakes are high and we emphasize that

> grudging and perfunctory review is not enough to satisfy the due
> process right to liberty, even for aliens.

Id. at 398 (emphasis added).[5]  It follows that submissions by the detainee showing, inter alia, reform, rehabilitation, good character, education, employment history and prospects, familial ties to United States citizens, potential for relief from removal, and any other evidence that contravenes danger to the community or risk of flight must be considered, as such evidence is highly relevant to ascertaining the detainee's current risk level.  See, eg., id. at 393 (explaining types of evidence detainee submitted in support of petition for bond); see also In re Guerra, 24 I. & N. Dec. 37, 40 (B.I.A. 2006) (listing factors to be considered in detainee bond determinations).

Furthermore, when assessing danger to the community, the extensiveness, recency, and severity of a detainee's past criminal activity must be considered.  Singh, 638 F.3d at 1206 (citing Guerra, 24 I. & N. Dec. at 40).  When assessing risk of flight, common-sense considerations include whether the imposition of conditions of release could mitigate flight risk, and whether the detainee has strong family ties to the United States.  Leslie, 865 F. Supp. 2d at 640; Chi Thon Ngo, 192 F.3d at 398.

Finally, although the Third Circuit has not yet addressed the issue, the court finds that the appropriate level of proof required from the government in these bond determinations is clear and convincing evidence of risk of flight or danger to the community.  In this regard, the court finds persuasive several decisions from other courts of appeals that have directly addressed this issue.  See Lora v. Shanahan, 804 F.3d 601, 616 (2nd Cir. 2015); Singh, 638 F.3d at 1203 (9th Cir. 2011).  As the Court of Appeals for the Ninth Circuit aptly explained,

---

[5] Notably, Chi Thon Ngo involved a post-removal detainee facing certain removal from the United States, unlike Petitioner and other section 1226 "pre-removal" detainees.  See id. at 392-95.

> [E]ven where prolonged detention is permissible, due process requires adequate procedural protections to ensure that the government's asserted justification for physical confinement outweighs the individual's constitutionally protected interest in avoiding physical restraint.  Because it is improper to ask the individual to share equally with society the risk of error when the possible injury to the individual—deprivation of liberty—is so significant, a clear and convincing evidence standard of proof provides the appropriate level of procedural protection.  The Supreme Court has repeatedly reaffirmed the principle that due process places a heightened burden of proof on the State in civil proceedings in which the individual interests at stake . . . are both particularly important and more substantial than the mere loss of money.  For [section 1226] detainees like Singh, who face years of detention before resolution of their removability, the individual interest at stake is without doubt particularly important and more substantial than mere loss of money, and therefore a heightened standard of proof is warranted.

Singh, 638 F.3d at 1203-04 (internal quotation marks and citations omitted).  The Singh court further reasoned that because a heightened standard of proof is applied in many other immigration contexts, including those where the immigrant bears the burden of proof, it makes sense that the "clear and convincing evidence" standard should also apply to the government in section 1226 bond hearings.  Id. at 1205 n.4.  This court agrees.

Therefore, when this court granted Petitioner's writ of habeas corpus and ordered that he receive a bond hearing, compliance with the foregoing legal standards at that hearing was required.  If Petitioner's bond hearing failed to comport with the law, this court—under its inherent power to enforce its habeas rulings—can take appropriate measures to ensure compliance.  These measures include, but are not limited to, providing Petitioner with an individualized bond hearing, see, e.g., Leslie v. Holder, 865 F. Supp. 2d 627 (M.D. Pa. 2012), or even ordering Petitioner's immediate release, see, e.g., Madrane v. Hogan, 520 F. Supp. 2d 654 (M.D. Pa. 2007).

C.  <u>The October 6, 2016 Bond Hearing</u>

As stated above, on October 6, 2016, a bond hearing in front of an immigration judge ("IJ") was conducted, which lasted approximately twenty minutes and was fatally flawed nearly from the start.  The hearing's multiple legal shortcomings will be discussed in turn.

*1.  Bond Hearing Must Be Individualized*

First, and perhaps most importantly, Petitioner's bond hearing was legally insufficient because it was not individualized.  From the opening seconds of the hearing, it was apparent that the IJ was unaware of the facts of Petitioner's case and had not reviewed or considered Petitioner's extensive supporting evidence for his request for bail, (Doc. 39-1, "Bond Hearing Exhibit 2").

Initially, the IJ was uncertain as to why Petitioner was even before him.  The IJ began the hearing by asking Respondents, "Has an NTA [Notice to Appear] been filed in this case?" and then requesting "any procedural background [because] I have nothing in here but a bunch of tax records."  (October 6, 2016 Bond Hearing Audio Recording at 00:40, (Doc. 38) [hereinafter "Bond Hearing"]).  The IJ continued, "I assume that there's a district court remand for a bond hearing . . . I don't have anything."  (<u>Id.</u> at 1:00).  The IJ then explained that he had Petitioner's September 29, 2016 letter, "an argument on flight risk, [ ] some tax records, and [ ] all kinds of stuff that [Petitioner] submitted" and that Petitioner "did a nice job" by giving the IJ "a lot of tax records and things like that."  (<u>Id.</u> at 2:40).

In fact, Petitioner provided the immigration court with a fifty-one page submission containing the following evidence: (1) a three-page letter giving a detailed

history of Petitioner's personal, immigration, employment, and criminal history; (2) a four-page legal argument on detainee bail determinations and flight risk; (3) a court order and an executed limited power of attorney to corroborate his mother's motor vehicle injury and her attorney's abandonment of the lawsuit; (4) Petitioner's January 24, 1998 determination of inadmissibility and expedited order of removal; (5) Petitioner's November 2007 denial of Form I-212; (6) IRS Form 1040s for 1999 to 2002 and 2004 to 2011 evidencing Petitioner's filing of federal income tax returns and payment of income tax; (7) Petitioner's May 19, 2015 notice of release and arrival indicating his "good conduct time release" from federal incarceration into ICE custody; (8) multiple notarized letters from Petitioner's co-workers and employers averring to his good character and plumbing expertise; (9) Petitioner's wife's June 21, 2016 notice of approval of relative immigrant visa petition; (10) a January 26, 2015 letter from the correctional center chaplain explaining that Petitioner, since the summer of 2013, had consistently attended Catholic Mass, participated as a musician for Catholic Mass, and acted as the music overseer and equipment trainer for the Mass programming; (11) a February 3, 2015 letter from the prison vocational coordinator explaining that Petitioner had been working since December 2013 for the vocational education department instructing other inmates in plumbing and HVAC in both English and Spanish, and that Petitioner also had worked on projects in the prison itself alongside the maintenance crew; (12) Petitioner's November 26, 2014 certificate of completion of "Choice and Change Drug Abuse Education Program"; (13) a copy of Petitioner's Nevada marriage certificate; (14) Petitioner's résumé outlining his extensive residential and commercial plumbing experience, licensing, and employment history; (15) copies of Petitioner's numerous plumbing and fire safety certificates and licenses; (16) a

copy of Petitioner's Nevada driver's license; (17) a September 27, 2016 letter from

Petitioner's daughter, Jocelyn Guerrero, directed to the Immigration Court (marked as

received on October 3, 2016) highlighting the difficulty of not having Petitioner to support

the family and requesting an affordable bail determination; and (18) a September 28, 2016

letter from Petitioner's daughter, Sandra Guerrero, directed to the Immigration Court

(marked as received on October 3, 2016) highlighting Petitioner's good character,

explaining the strain of losing Petitioner's financial and familial support, and requesting an

affordable bail determination.  (Doc. 39-1).

       At several different times the IJ questioned Petitioner whether there was

"anything specific" in his supporting submission that he wanted the IJ to consider.  (Bond

Hearing at 8:10 & 9:03).  As Petitioner argues, and this court agrees, the fifty-one pages of

supporting evidence was compiled and submitted because Petitioner desired, quite

reasonably, that the IJ consider *all* the evidence at the bond hearing.

       Furthermore, because the IJ was completely unfamiliar with the facts of

Petitioner's case, including the procedural posture of his application for protection under

the CAT, he questioned Petitioner and Respondents as to the status of the removal

proceedings.  (Id. at 10:32).  Petitioner responded by informing the IJ that he had been

granted an actual stay of removal by the Third Circuit pursuant to the requirements found

in Nken v. Holder, 556 U.S. 434-36 (2009) (setting out factors considered by a court when

implementing a stay in removal cases, including that the stay applicant must make "a

strong showing that he is likely to succeed on the merits" and demonstrate that he would

be "irreparably injured absent a stay").  (Bond Hearing at 10:59).[6]  However, it does not

appear that the IJ credited Petitioner's explanation, because the IJ immediately

questioned the validity of Petitioner's response and then asked Respondents to clarify the

status of the removal proceedings.  (Id. at 11:19).  Respondents then incorrectly informed

the IJ that Petitioner had only received a temporary stay under the Third Circuit's standing

order, rather than an actual stay of removal under Nken.  (Id. at 12:01).

       As the foregoing facts make clear, Petitioner's bond hearing fell far short of

the "individualized" determination that the law demands.  An individualized bond hearing

requires—at a bare minimum—that the presiding judge reviews and considers the

evidence presented by the detainee.  Often, like here, the detainee is acting pro se and

does not speak English, and is unable to effectively elocute his position through an

interpreter during the hearing; thus, the detainee's written submissions, which can be

more carefully crafted and translated in advance, are a critical part of the detainee's

opportunity to be heard.

       An individualized hearing further requires—also at a minimum—that the

presiding judge understand the detainee's immigration status, including whether the

detainee may still avoid removal from the United States.  Failure to meet such basic

requirements subverts the purpose of the section 1226 bond hearing.

*2.  Risk Assessment Must Be on a Current Basis*

       The October 6 bond hearing also fails because it was not a current

assessment of Petitioner's risk of flight or danger to the community.  While the IJ

repeatedly focused on Petitioner's drug conspiracy offense, which occurred five years ago,

---

[6] The court also notes that Petitioner fully explained the status of his application for protection
under the CAT in his September 29, 2016 letter to the IJ, indicating that a stay of removal—not just
a temporary stay—had been issued by the Third Circuit pursuant to Nken.  (See Doc. 26-1 at 12).

it is questionable whether the IJ even reviewed or considered the extensive evidence of

rehabilitation Petitioner provided, or other pertinent sections of the Presentence

Investigation Report ("PSR"), (Doc. 41, Bond Exhibit 1).

      This evidence includes, <u>inter</u> <u>alia</u>, proof that Petitioner has no criminal history

beyond his one conspiracy conviction; Petitioner accepted responsibility for his actions;

Petitioner has repeatedly expressed remorse for his prior criminal episode; Petitioner had

no disciplinary infractions while incarcerated or detained; Petitioner averred that he had

never missed an immigration court hearing or proceeding; Petitioner served only thirty-

seven months of a forty-two-month sentence for good conduct; Petitioner completed a

drug and alcohol rehabilitation program while incarcerated; Petitioner taught vocational

education classes to other inmates while incarcerated; Petitioner continuously attended

and participated in religious services while incarcerated; Petitioner has employers who are

ready and willing to employ Petitioner if he were released and allowed to work; and,

importantly, Petitioner had an ongoing CAT claim to avoid removal that was under review

by the Third Circuit, which found that he met the <u>Nken</u> stay requirements.

      As the Third Circuit admonishes, it is not that past "convictions are no longer

relevant.  Due process is not satisfied, however, by rubberstamp denials based on

temporally distant offenses.  The process due even to . . . aliens requires an opportunity

for an evaluation of the individual's *current* threat to the community and his risk of flight."

<u>Chi Thon Ngo</u>, 192 F.3d at 398 (emphasis added).  Thus, while Petitioner's prior

conspiracy conviction is relevant, it does not place him "forever beyond redemption."  <u>Id.</u>

"To presume dangerousness to the community and risk of flight based solely on

[Petitioner's] past record does not satisfy due process."  <u>Id.</u> at 398-99.  Accordingly, the

IJ's failure to consider Petitioner's threat to the community or risk of flight on a current basis—in light of the extensive evidence Petitioner provided—and instead relying almost exclusively on Petitioner's past criminal conduct, falls short of the due process the law requires.

Moreover, at no time did the IJ consider conditions of release to mitigate any flight risk that Petitioner may have posed, even though Petitioner himself suggested that the IJ implement, if necessary, "any of the various forms of supervised release that are appropriate in the circumstances[,] which may include electronic monitoring . . . ." (Doc. 26-1 at 16). The IJ not only ignored Petitioner's request, but failed to even address the issue during the bond hearing. This omission contravenes explicit federal court guidance. See Leslie, 865 F. Supp. 2d at 640-41; Chi Thon Ngo, 192 F.3d at 398.

*3. The Government Has the Burden of Proof*

Finally, even under a preponderance of the evidence standard, it is doubtful that Respondents carried their burden to show that Petitioner is currently a flight risk or danger to the community.

Against the extensive evidence put forth by Petitioner to counter risk of flight or dangerousness, Respondents merely relied on Petitioner's years-old conspiracy conviction—outlined in the PSR—and the subsequent punishment imposed. Multiple times during the hearing the IJ asked Respondents if they wanted to point out anything specific to the court in support of their burden, and Respondents either relied on the conspiracy conviction or responded that they had nothing more to add. (Bond Hearing at 6:30, 7:02, 14:04, 18:32). Moreover, it was the IJ, not Respondents, who raised the issue

of Petitioner's lack of property ownership, a circumstance that apparently factored into the IJ's calculus that Petitioner was a flight risk, (Bond Hearing at 17:38).

Again, there is no doubt that a detainee's criminal history is relevant to a bail determination.  But due process is not satisfied by mere reliance on the detainee's criminal record alone.  <u>Chi Thon Ngo</u>, 192 F.3d at 398-99.  Rather, the government has the burden to show that the detainee, at the present time, presents a danger to the community or a risk of flight.  Here, Respondents merely relied on Petitioner's sole conspiracy conviction and put forth no other evidence that Petitioner presently represents a flight risk or danger to the community.

Under such circumstances, it is exceedingly doubtful that Respondents carried their burden at the bond hearing, even under a preponderance of the evidence standard.  Even if, however, Respondents managed to do so, the above-discussed lack of individualization and failure to make a current risk assessment would still compel a finding that the October 6 hearing did not meet the minimum requirements of section 1226 bond hearings.

*V.*        *Conclusion*

Rafael Ingacio Guerrero Sanchez has now been detained for more than one year and seven months beyond the thirty-seven months' incarceration he served for his underlying criminal conviction.  The law requires that he receive an individualized bond hearing, where a neutral and detached arbiter makes a current assessment of whether continued detention is necessary to effectuate the goals of the detention statute.

The court appreciates the challenging and often overburdened dockets of the immigration court.[7]  But the fundamental, constitutionally protected liberty interest at stake in section 1226 bond hearings demands heightened procedural protections and the utmost care and attention.  "The stakes are high and [the court] emphasize[s] that grudging and perfunctory review is not enough to satisfy the due process right to liberty, even for aliens."  Chi Thon Ngo, 192 F.3d at 398.

Therefore, based on the foregoing analysis, the court will deny as moot Petitioner's motion to reopen or reconsider (Doc. 25), and will grant Petitioner's motion to enforce (Doc. 26).  Accordingly, the court will hold its own individualized bond hearing governed by the legal precepts cited within this memorandum at an appropriate date and time.  At this hearing, Respondents shall bear the burden of proving, by clear and convincing evidence, that Petitioner's continued detention is necessary to fulfill the purposes of the detention statute—i.e., "ensuring that [Petitioner] attends removal proceedings and that his release will not pose a danger to the community."  Diop, 656 F.3d at 231.  An appropriate order will follow.


/s/ William W. Caldwell
William W. Caldwell
United States District Judge

---

[7] See Abulashvili v. U.S. Att'y Gen., 663 F.3d 197, 208 & n.10 (3d Cir. 2011) (explaining that immigration judges must deal with "an exponential growth in their caseloads," and that immigration courts often are "overburdened and under-resourced") (citations omitted).